**David FRAZIER, Hattie Bradley, Bonnie Alexander and Juanita Griffin, Individually and on Behalf of Others Similarly Situated, Plaintiffs–Appellants,**

**v.**

**GARRISON I.S.D., Tyler I.S.D., Terrell I.S.D., Troup I.S.D., State of Texas, Texas Central Education, Texas Commission of Education, and Texas Education Agency, Defendants–Appellees.**

No. 91–4958.

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1993.

Larry Robert Daves and Carmen Rumbaut, San Antonio, Tex., for plaintiffs-appellants.

Ron Adkison, Wellbonr, Houston, Adkison, Mann & Sadler, Henderson, Tex., and Franklin Moore, Murphy, Moore & Bell, Fort Worth, Tex., for Garrison I.S.D.

James Connor Thompson, Asst. Atty. Gen., Austin, Tex. and John L. Ross, Thompson, Coe, Cousins & Irons, Dallas, Tex., for State of Texas, TX Cent. Educ. et al.

John Shelton Aldridge, Walsh, Judge, Anderson, Underwood & Schulz, Austin, Tex., for Terrell I.S.D.

Jack A. Jackson, Jackson & Jackson, Tyler, Tex., for Troup I.S.D.

Before BROWN, GARWOOD, and DEMOSS, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

### PROLOGUE

Plaintiff schoolteachers (Teachers) brought this suit in the United States District Court for the Eastern District of Texas against several school districts (School Districts) and the State of Texas and its

various agencies (State)[1] challenging the constitutionality of the Texas Examination for Current Administrators and Teachers (TECAT). The Teachers alleged that the TECAT, a state administered examination for teachers that tested basic reading and writing skills, violated Title VI and Title VII of the 1964 Civil Rights Act, the Age Discrimination In Employment Act (ADEA), the Equal Educational Opportunities Act of 1974, and the Due Process and Equal Protection Clauses of the Constitution. The Teachers moved the trial court pursuant to Rule 42(a) to consolidate this case with *United States v. Texas*, 447 F.2d 441 (5th Cir.1971), *cert. denied*, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972), a long-running state desegregation case, on the ground that this case and the *Texas* case involved common questions of law and fact. The Teachers also moved the trial court to certify them as a class for purposes of maintaining a class action. The trial court refused to certify the class, denied the Teachers' motion to consolidate, and granted summary judgment in favor of the School Districts on the Title VI claim, the Title VII claim, the ADEA claim, and the Due Process and Equal Protection claims. This is an appeal from the district court's final judgment. We affirm.

## HOW IT ALL BEGAN

### *History Of The TECAT*

On July 3, 1984, the Texas legislature passed into law House Bill 72[2] which contained numerous provisions for education reform including school funding, school finance reform, teacher raises, establishment of a teacher career ladder, provisions for school discipline management, restructuring of the State Board of Education (Board), and teacher competency testing. Section 13.047 of the act,[3] which provides for teacher competency testing, is the section at issue on this appeal. Section 13.047 provides:

(a) The board shall require satisfactory performance on an examination prescribed by the board as a condition to continued certification for each teacher and administrator who has not taken a certification examination under Section 13.032(e) of this code.

(b) The board shall prescribe an examination designed to test knowledge appropriate to teach primary grades and an examination designed to test knowledge appropriate to teach secondary grades. The secondary teacher examinations must test the knowledge of each examinee in the subject areas listed in Section 21.101 of this code in which the examinee is certified to teach and is teaching. If a teacher is not tested in an area of certification, the teacher must take the examination for that area within three years after beginning to teach that subject. The administrator examinations must test administrative skills, knowledge in subject areas, and other matters that the board considers appropriate. The examinations must also test the ability of the examinee to read and write with sufficient skill to perform satisfactorily as a professional teacher or administrator.

(c) In developing the examinations, the board shall solicit and consider the advice of classroom teachers and administrators.[4]

(d) Each teacher must perform satisfactorily on the applicable examination on or before June 30, 1986, to teach the subject at a particular level unless a school district establishes to the satisfaction of the commissioner of education that there is an emergency need. A teacher may not teach under a determination of an emergency need for more than one school year.

(e) The board, in conjunction with school districts, shall provide teachers and administrators with an opportunity for board-developed preparation for the ex-

---

1. Unless otherwise specified, the defendants are referred to collectively as the School Districts.

2. 1984 Tex.Sess.Law Serv. 269 (Vernon).

3. Tex.Educ.Code Ann. § 13.047 (West 1991).

4. Sections (c) to (e) were repealed by Acts 1987, 70th Leg., ch. 32, § 2, eff. April 25, 1987.

amination, including an opportunity for remedial aid.

(f) The board may limit the number of times a teacher or administrator who fails to perform satisfactorily on an examination may retake it, but each teacher must be given more than one opportunity to perform satisfactorily. The board shall determine the level of performance that is satisfactory.

(g) The board may exempt from the examination required by this section any person who, before the examination adopted under this section is prescribed, performed satisfactorily on an examination administered by an employing district if the board finds the examination to be substantially the same or at least as difficult as the examination prescribed by the board.

At its next session, however, the Texas legislature only appropriated enough funds [5] for the Board to administer an examination that tested basic reading and writing skills.[6] This examination became known as the Texas Examination for Current Administrators and Teachers (TECAT). In keeping with the mandate of section 13.047(f) of the act, which required that teachers who failed be given the opportunity to retake the exam at least one more time before the June 30, 1986, cut-off date, the Board offered the TECAT on March 10, 1986, and again on June 28, 1986. All teachers in Texas, regardless of the duration of their teaching tenure, were required to pass the TECAT before they could obtain recertification.

Shortly after the Board began administering the TECAT, Project Principle, a non-profit corporation composed of certified public school teachers and administrators, brought suit against the State of Texas in state district court alleging, *inter alia,* that section 13.047 was unconstitutional as violative of federal due process and equal protection.[7] *State v. Project Principle,* 724 S.W.2d 387, 389 (Tex.1987). The Texas Supreme Court held that the administrative procedures contained in the Texas Administrative Procedures Act,[8] which provided a teacher both the right to appeal the revocation of his teaching license to the commissioner of education, and the right to judicial review of that administrative proceeding in a state district court, were sufficient to satisfy the due process guarantees of the Fourteenth Amendment. 724 S.W.2d at 391. In addition, the Texas Supreme Court held that section 13.047 did not violate the equal protection clause of the Texas Constitution [9] because the classification of teachers into those who passed the test and those who failed the test bore a rational relationship to the legitimate state objective of maintaining competent teachers in the public schools; therefore, section 13.-047 was constitutional. *Id.*

Shortly thereafter two African–American teachers challenged the TECAT in the United States District Court for the Eastern District of Texas alleging that the Board and the State of Texas chose a cutoff score on the TECAT that worked to discriminate against them based on age and race in violation of Title VII, the ADEA, and the Employee Retirement Income Security Act (ERISA). *Fields v. Hallsville Indep. School Dist.,* 906 F.2d 1017, 1018 (5th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991). The suit named the Texas Education Agency, Texas Commissioner of Education, Texas State Board of Education, State of Texas (collectively, the State), and the Hallsville Independent School District (HISD) as defen-

---

**5.** 1985 Tex.Sess.Law Serv. 7284 (Vernon).

**6.** Rider 18 to the Act.

**7.** In an earlier case, the Texas State Teachers Association brought suit in state district court seeking a declaratory judgment that section 13.-047 was unconstitutional as an impairment of the obligation of contracts in violation of Tex. Const. art. I, § 16 (1984). *Texas State Teachers Ass'n v. State,* 711 S.W.2d 421, 423 (Tex.App.—

Austin 1986, writ ref'd n.r.e.). The Texas Court of Appeals held that any impairment of the teachers' rights occurring as a result of the TECAT was justified as incident to the valid exercise of the state's police power in regulating education. *Id.* at 425.

**8.** Tex.Admin.Code tit. 19, § 157.1(b) (1992).

**9.** Tex. Const. art. I, § 3.

dants. *Id.* The federal district court granted summary judgment for the State defendants on the ground that the State was not the teacher's employer; in addition, the district court granted summary judgment for HISD on the ground that, under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), a Title VII action could not be maintained unless the plaintiffs, after losing their jobs, had applied for a job for which they are qualified. *Fields,* 906 F.2d at 1021. In that case, the district court found that the teachers' verbal expression of interest did not create a genuine issue that the teachers *applied* for vacancies. On appeal, the Fifth Circuit affirmed. *Id.* at 1021–22.

The case at hand involves a similar challenge to the TECAT as that decided in *Hallsville.* 906 F.2d at 1017. The Teachers have cited to numerous conflicting statistical analyses of the discriminatory or nondiscriminatory impact of the TECAT both on minority schoolteachers and schoolteachers over forty years of age. The relevant statistical studies provided by counsel are tabulated in the Appendix to this opinion.

### The Case At Hand

This case is an appeal from the final judgment of the United States District Court for the Eastern District of Texas. On September 21, 1989, David Frazier filed suit against Garrison Independent School District (Garrison), the Texas Central Educational Agency, the Texas State Board of Education, and the State of Texas alleging that the defendants violated the Age Discrimination In Employment Act, 29 U.S.C.A. § 621–34 (1985) and Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq.,* by discharging him for failing the TECAT.[10] On September 25,

1989, three other African–American teachers joined Frazier and together they filed an amended complaint on behalf of themselves and others similarly situated alleging that the defendants had unlawfully discharged them on the basis of either age or race in violation of the ADEA and Title VII.[11] Plaintiffs subsequently added a Title VI claim, an Equal Educational Opportunities Act claim, a Due Process claim, and an Equal Protection claim to their original complaint;[12] in addition, the Teachers sought to enjoin use of the TECAT alleging that the TECAT violated the modified court order entered in *U.S. v. Texas,* 447 F.2d 441 (5th Cir.1971), *cert. denied,* 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972), which required the state to take affirmative steps to desegregate the public schools.[13] The Teachers then moved the trial court to certify as a class teachers over forty years of age who were terminated after certification was withdrawn as a result of their failing the TECAT. The trial court entered summary judgment against the Teachers on all claims, denied the motion to consolidate, and refused to certify the class. This appeal followed.

The unintended effects of the TECAT on the individual lives of the named plaintiffs in this case is tragic. Frazier was sixty years old at the time he was terminated. He had been a teacher at Garrison ISD for twenty-nine years.[14] During those years, his job evaluations were consistently satisfactory and above in all categories.[15] Since his termination in August of 1986, as a result of his failing the TECAT, Frazier has been unable to find reemployment as a public school teacher.

Bradley was a teacher at Tyler ISD at the time she was terminated. Her father was a teacher and a principal, and her stepmother was a principal. Bradley's daugh-

---

**10.** Plaintiff's Original Complaint, V. 5, pp. 2052–57.

**11.** Plaintiff's First Amended Complaint, V. 5, pp. 2036–45.

**12.** Plaintiff's Second Amended Complaint, V. 5, pp. 1936–48, and Plaintiff's Fourth Amended Complaint, V. 3, pp. 902–918.

**13.** Trial Court Order (*U.S. v. Texas* (Civil Action 5281)), V. 5, p. 1906.

**14.** Affidavit of David Frazier, V. 2, p. 422.

**15.** Performance Evaluations of David Frazier, V. 2, pp. 433–40.

ter and two sons are all college graduates. For years, Bradley worked as a volunteer in her community emphasizing education and literacy. In addition to being actively involved with the national reading program called "Reading is Fundamental," Bradley worked as a volunteer with the library, running the library's Bookmobile. Tyler Independent School District promptly terminated Bradley in the fall of 1986 after she failed the TECAT.[16] Although we don't elaborate on the personal stories of the two remaining named plaintiffs in this case, Griffin and Alexander, the TECAT has had an equally tragic effect on their lives.

## SUMMARY JUDGMENT IN FAVOR OF THE SCHOOL DISTRICTS

 The trial court granted summary judgment under F.R.Civ.P. 56(c) in favor of the School Districts on the Title VII claim, the ADEA claim, and the Due Process and Equal Protection claims. Under F.R.Civ.P. 56(c), a party is entitled to summary judgment as a matter of law if, when the evidence is viewed in the light most favorable to the nonmovant, there are no genuine issues of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that the plain language of Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial). The determination of whether a factual dispute exists must be governed by the substantive evidentiary standards that apply to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (holding that where the clear and convincing evidence requirement applied, the appropriate summary judgment question in a defamation case was whether the evidence in the record would support a reasonable jury finding either that the plaintiff has shown actu-

al malice by clear and convincing evidence or that the plaintiff has not). An appellate court reviews a trial court's grant of a motion for summary judgment under the same standard as that used by the trial court—the appellate court employs a *de novo* standard of review with respect to the law and the facts are viewed with deference to the nonmovant even though the court need not defer to any fact assumptions made by the trial court. *E.E.O.C. v. Southern Publishing Co.*, 894 F.2d 785, 789 (5th Cir.1990); *Moore v. Mississippi Valley State Univ.*, 871 F.2d 545, 548–49 (5th Cir.1989); *New York Life Ins. Co. v. Baum*, 707 F.2d 870, 871 (5th Cir.1983).

The Teachers' shotgun approach to appellate advocacy is merciless. Rarely do the Teachers indicate precisely the legal standard that this court is supposed to apply when reviewing the numerous claims that they have brought against the defendant School Districts. In addition, the Teachers have not adequately addressed the appropriate standard of review. Since the burden on appeal is on the Teachers, in the absence of a determination that the trial court erred in the proceedings, we cannot reverse.

### Title VI: Is It In Or Out?

 As a preliminary matter, the School Districts assert that the Teachers have abandoned their claims under Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d *et seq.*, and under the Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1701 *et seq.* (addressed in the next section). First, with regard to the Title VI claim, the Teachers contend that they have not abandoned their Title VI claim, rather they inadvertently placed their Title VI claim in their brief under the heading "Due Process and Equal Protection." In the "Due Process and Equal Protection" section, the Teachers do not once mention Title VI. Furthermore, the Teachers have not cited to either the statutory sections where Title VI is codified, to cases that define the scope of Title VI claims, or to the order of the trial court indicating to this court

---

**16.** Affidavit of Hattie Bradley, V. 2, p. 346.

where the trial court allegedly erred in its application of Title VI.

The district court resolved the Teachers' Title VI claim in favor of the School Districts on the ground that the statute of limitations had run. Although the "Due Process and Equal Protection" section of the Teachers' brief (Section III) contains some discussion of a statute of limitations, that section doesn't indicate which statute is at issue. Appellant's Brief at 45. Since this is the only part of the Teachers' brief that discusses any statute of limitations, and since the district resolved the Title VI claim on the ground that the statute of limitations had run, we conclude that the discussion of the statute of limitations found under the heading of "Due Process and Equal Protection" was meant to apply to the Teachers' Title VI claim.

The district court held that in cases where there is no federal statute of limitations for a cause of action arising under a federal civil rights statute, the federal courts must apply the most appropriate statute of limitations period provided by state law. *Johnson v. Railway Express Agency*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975); *Dumas v. Town of Mount Vernon*, 612 F.2d 974, 977 (5th Cir.1980). In *Wilson v. Garcia*, 471 U.S. 261, 276, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985), the Supreme Court held that all claims brought under 42 U.S.C. § 1983 should be characterized as personal injury claims for the purposes of determining which state statute of limitations should be applied. The district court held that since Title VI, like § 1983, involved a claim of discrimination in public employment, considerations of fairness and uniformity dictated the same statute of limitations apply to a Title VI claim as to a § 1983 claim.[17] For that reason, the district court characterized the Teachers' Title VI claim as a claim for personal injury and applied the Texas two year statute of limitations.[18] The Teachers do not argue on appeal that the trial court erred in conclud-

ing that the Texas two year statute of limitations was applicable. Rather, the Teachers argue that the statistical evidence indicates that they are victims of continuous discrimination; consequently, in a claim involving continuous discrimination, the statute of limitations does not bar Teachers' claim for relief. *Glass v. Petro–Tex Chemical Corp.*, 757 F.2d 1554 (5th Cir.1985). The Teachers have misstated the applicable law in this area. *Petro–Tex Chemical* involved a sex-discrimination suit filed against Petro–Tex Chemical for refusal to promote allegedly due to gender discrimination. 757 F.2d at 1556. The court held that since the plaintiff did not file her complaint with the EEOC until after the two year statute of limitations had run, her claim was time-barred unless she could show a "continuous violation." *Id.* at 1560. The court held that although the case law on the subject of continuing violations is inconsistent and confusing, the core idea is that equitable considerations may require an extension of the filing period when supportive facts exist. *Id.* In addition, the court held that a mere perpetuation of the effects of time-barred discrimination does not constitute continuous discrimination. *Id.* at 1561.

In the case at hand, there are no equitable considerations that would lead this court to conclude that the Teachers' time period for filing a Title VI claim should be extended. This case is distinguishable from *Petro–Tex Chemical* because the plaintiff in *Petro–Tex Chemical* could argue that the company's refusal to promote her would not necessarily indicate to a reasonably prudent person that the company's actions were taken with an intent to discriminate. *Id.* at 1561–62. In the case at hand, if the Teachers are going to file a suit sounding in racial discrimination, they should have done so when they were discharged, because the discharge itself is the basis for the discrimination suit. No facts exist that indicate to us that the alleged

---

17. District Court Order, V. 1, p. 5–6.

18. "A person must bring suit for ... personal injury ... not later than two years after the day the cause of action arose." Tex.Civ.Prac. & Rem.Code Ann. § 16.003 (West 1986); District Court Order, V. 1, p. 6–7.

discrimination was either hidden or for some reason not apparent to a reasonably prudent person. We conclude that there are no equitable considerations to support extension of the Texas two year statute of limitations. Since this is the Teachers' only argument as to why the Texas statute of limitations ought not to apply, the Teachers' Title VI claim is barred.

### The Equal Educational Opportunities Act Claim

With regard to the Teachers' claim under the Equal Educational Opportunities Act claim, this issue is not to be found in the Teachers' brief.[19] Therefore, we cannot address it on appeal.

### Title VII Claim

The trial court held that the Teachers did not fulfill one of the requirements of maintaining a Title VII action and an ADEA action, namely, that the Teachers apply for positions for which they were qualified as required by the Supreme Court in *McDonnell Douglas*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The Teachers were informed that once they had failed the TECAT, they would be considered unqualified for certified teaching positions and that they would have to apply for non-certified positions as a prerequisite to maintaining both a Title VII and an ADEA claim.[20] In addition, the trial court pointed out that the Teachers' Fourth Amended Complaint failed to allege that the Teachers applied for non-certified positions, and, furthermore, the School Districts presented

*uncontroverted* evidence that the Teachers failed to apply for non-certified positions with their respective school districts.[21] The standard under *Fields v. Hallsville Independent School District*, 906 F.2d 1017, 1021 (5th Cir.1990), is a strict one: the applicants must follow up on their initial expression of interest by actually applying for a position—an oral expression of interest is insufficient. The Teachers have presented no evidence to contradict the School Districts' assertion that the Teachers did not apply for non-certified teaching positions. Therefore, the district court did not err in concluding, as a matter of law, that the Teachers did not apply for non-certified teaching positions as required by *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Although the trial court never reached the issue of whether the Teachers made a prima facie case of discrimination, this issue is of sufficient importance that we address *de novo*, as we may, the Teachers' arguments regarding their substantive Title VII claims on appeal. The burden on parties seeking recovery under Title VII of the Civil Rights Act of 1964 has shifted back and forth over the last decade and is, at best, confusing.[22] Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, makes it illegal for an employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of an individual's race, color, religion, sex, or national origin.[23] In *Griggs v. Duke Power*

---

**19.** The Teachers in their pleadings have alleged that the School Districts' actions violated the Equal Educational Opportunities Act. Plaintiff's Second Amended Complaint, V. 5, p. 1947; Plaintiff's Fourth Amended Complaint, V. 3, p. 914. The district court order granting summary judgment in favor of the School Districts did not address this issue, and the Teachers have not raised this issue on appeal. District Court Order, V. 1, p. 4–14. We cannot address an issue that has neither been raised by the appellant-Teachers, nor briefed by either party. The scope of appellate review is limited to matters that both appear in the trial court record and that the aggrieved party promptly objected to before the trial court.

**20.** Trial Court Order, V. 1, p. 20.

**21.** Trial Court Order, V. 1, p. 20.

**22.** *See infra* note 34 and accompanying text.

**23.** 42 U.S.C. § 2000e–2(a) provides as follows:
"(a) It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive

*Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), the Supreme Court held that Title VII prohibits both overt discrimination and "practices that are fair in form but discriminatory in practice." This holding requires the recognition of two theories of liability under Title VII: the "disparate impact" theory and the "disparate treatment" theory. Under the disparate impact theory, a facially neutral employment practice can be in violation of Title VII even if there is no evidence of an employer's subjective intent to discriminate. But, for disparate impact purposes, depending on the type of data used to compile the statistics, an allegation that there exists a statistical discrepancy in the racial composition of the workforce may not be sufficient. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645–46, 109 S.Ct. 2115, 2118–19, 104 L.Ed.2d 733 (1989). Under the disparate treatment theory, however, Title VII is violated only if the employee can show that the employer intentionally treated the employee unfairly because of race, color, religion, sex, or national origin. *Id.*

In the case at hand, whether the Teachers are asserting a disparate impact or disparate treatment theory of liability is, at best, unclear—the Teachers' brief does not specifically address the legal standard for either theory. In one section of their brief, the Teachers contend that the School Districts' improper actions have a disparate impact on minority teachers and older teachers. Appellant's Brief at 38. In another part of their brief, however, the Teachers explicitly contend that the School Districts' improper actions result in disparate treatment and *not* disparate impact. Appellant's Brief at 57. Because the Teachers' arguments with regard to disparate impact/treatment under Title VII is

confusing, we address both these issues with minimal reference to the Teachers' brief. The Teachers cite *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) for the proposition that a prima facie disparate impact case can be made by showing that minority teachers and older teachers were adversely affected by the TECAT. The statistics cited by the Teachers indicate that the failure rate of African–American teachers is higher than the failure rate of white teachers, and that this difference increases with age.[24] Although statistical proof alone can make out a prima facie case of disparate impact, the Court in *Wards Cove* reversed the Court of Appeals' use of those particular statistics as the basis for an initial inquiry in a disparate impact case. 490 U.S. at 650–51, 109 S.Ct. at 2121–22. The *Wards Cove* case involved a challenge by a class of nonwhite [predominantly Alaskan Native] cannery workers (Workers) to the hiring and promotion practices of two salmon canneries (Canneries) in remote and widely separated areas of Alaska. *Id.* The Workers contended that the lack of objective hiring criteria, the rehiring preferences, the nepotism, the separate hiring channels, and the practice of not promoting from within created racial stratification in the work force in violation of Title VII. *Id.* at 647–48, 109 S.Ct. at 2119–20. On appeal, the Supreme Court held that the Court of Appeals erred in concluding that the Workers' statistics, which showed a high-percentage of nonwhite workers in the cannery jobs and a low-percentage of white workers in the non-cannery jobs, were the proper basis for determining whether a prima facie case of disparate impact existed. *Id.* In particular, the Court's opinion emphasized that the

---

any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

**24.** The appendix contains five charts that summarize the statistical data provided by the parties:

 I. *TECAT Pass Rates On The March 10, 1986 Exam By Ethnicity*

 II. *TECAT Cumulative Pass Rates From March 1986—February 1988.* This chart indi-

cates that there is 9.3% difference in the passages rate of whites versus blacks, and a 2.24% difference in the passage rate of whites versus hispanics.

 III. *TECAT Cumulative Pass Rates From March 1986—April 1989*

 IV. *Pass Rates By Ethnicity And Age*

 V. *Failure Rates By Ethnicity—October 1986 TECAT*

correct statistical measure for discriminatory impact purposes was the ratio of skilled noncannery workers to the "the pool of *qualified* job applicants" or the "*qualified* population in the workforce," not to the cannery workforce. *Id.* at 651, 109 S.Ct. at 2122. "[C]omparing the number of nonwhites occupying these [nonskilled cannery] jobs to the number of nonwhites filling cannery worker positions is nonsensical. If the absence of minorities holding such skilled positions is due to a dearth of qualified nonwhite applicants (for reasons that are not petitioners' fault), petitioners' selection methods or employment practices cannot be said to have had a 'disparate impact' on nonwhites." *Id.*

The *Wards Cove* case clearly does not stand for the proposition that any adverse impact as shown by a statistical discrepancy, irrespective of magnitude, is sufficient to make out a prima facie case of disparate impact. The specific holding of *Wards Cove* was that statistical proof used by the Court of Appeals was inaccurate a measure of statistical disparity because it did not take into account the "qualified" versus "unqualified" workforce.[25] *Id.* at 651, 109 S.Ct. at 2122.

The statistical data cited by the Teachers indicate that the cumulative pass rate on the TECAT from March of 1986 to April of 1989 for all teachers eventually exceeded 95%.[26] Specifically, for African–American teachers, the cumulative pass rate was 95.-58%.[27] In the final analysis, the cumulative difference in the pass rates of white and African–American teachers was only four and a half percentage points.[28] This court held in *Moore v. Southwestern Bell Telephone Co.*, 593 F.2d 607, 608 (5th Cir.1979), that employment examinations having a 7.1 percentage point differential between black and white test takers do *not*, as a matter of law, state a prima facie case of disparate impact.[29] Therefore, there is no significant statistical discrepancy between minority and non-minority pass rates.

In addition to presenting evidence of an alleged statistical disparity, the Teachers present a study conducted on the TECAT by the Center for the Study of Evaluation at the University of California as evidence of a prima facie case of disparate impact.[30] The study referred to by the Teachers characterizes the TECAT as a "basic literacy test with harsh consequences," rather than a competency test.[31] "At the same time that some illiterate teachers sneak past the test, some teachers with badly needed skills fall by the way. Disproportionately high failure rates were reported for minorities especially blacks ... [i]t is important

25. *See also Davis v. Yazoo County Welfare Dept.*, 942 F.2d 884 (5th Cir.1991); *Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir.1991); *EEOC v. J.M. Huber Corp.*, 927 F.2d 1322 (5th Cir.1991); *Hill v. Mississippi State Employment Service*, 918 F.2d 1233 (5th Cir.1990); *Black Fire Fighters Of Dallas v. City of Dallas*, 905 F.2d 63 (5th Cir. 1990).

26. Appendix, Chart III. *TECAT Cumulative Pass Rates From March 1986—April 1989.*

27. *Id.*

28. *Id.*

29. There are cases which hold that statistical variations of two or three standard deviations from the mean are sufficient to establish statistical significance. *Castaneda v. Partida*, 430 U.S. 482, 496, 97 S.Ct. 1272, 1281, 51 L.Ed.2d 498 (1977); *Rendon v. AT & T Technologies*, 883 F.2d 388 (5th Cir.1989); *Pegues v. Mississippi State Employment Service*, 699 F.2d 760 (5th Cir.1983), *cert. denied*, 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983), *rev'd in part on* other grounds, 899 F.2d 1449 (5th Cir.1990); *Williams v. New Orleans Steamship Association*, 673 F.2d 742 (5th Cir.1982), *cert. denied*, 460 U.S. 1038, 103 S.Ct. 1428, 75 L.Ed.2d 789 (1983).

The Teachers have not provided this court with a concise statistical analysis of minority pass rates on the TECAT in terms of standard deviation. The Teachers refer to a study in the record that analyzes the minority pass rates by age *and* race showing that the number of standard deviations may vary from 10.84 to 25.54 depending on age. Appellant's Brief at 19 and 42; V. 4, p. 1279. The Teachers, however, have not shown this court how data that shows a 95.58% cumulative passage rate for African–American teachers can be translated into a statistical model capable of analysis in terms of standard deviations. Without further analysis of the data, we cannot address this line of argument.

30. Report By The Center For The Study of Evaluation, V. 1, p. 105 [hereinafter Study].

31. *Id.* at 160.

for policy makers to realize that TECAT did not single out the unprepared, indifferent, inexpert teachers they had in mind when they envisioned the test."[32] The Teachers also argue that their expert witness analyzed the TECAT and concluded that it was not a reliable test because it was not job related and it did not measure the competency of teachers. Appellant's Brief at 20. Both the Teachers' argument and Teachers' evidence are directed to the relative merit or lack of merit of the TECAT itself as a tool for measuring the competency of public school teachers, not whether the TECAT is violative of Title VII. Passing the TECAT is a requirement for all certified teachers in the State of Texas, not just minority teachers or older teachers. There is no "subjective" criteria involved in administering the TECAT, and there is no "subjective decision making" on the part of the school administrators. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 2778, 101 L.Ed.2d 827 (1988); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989). We consider this evidence of no significance because district court neither credited nor discredited it. The Teachers have not dem-

onstrated the existence of employment practices (other than the allegedly illegal TECAT) that the School Districts are engaged in that are fair in form, but discriminatory in practice. *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853. The same study cited by the Teachers concluded that ultimately ninety-nine percent of the teachers passed the TECAT, and, for this reason, the general public was not convinced that the TECAT accomplished its goal of eliminating incompetent teachers from the public school system.[33] Because the Teachers have failed to present any evidence that raises a genuine issue of material fact with regard to the existence of a statistical disparity, they have failed to make a prima facie case of disparate impact under Title VII. Summary judgment was appropriate.

■ If the Teachers had successfully established a prima facie case of disparate impact, then the case would shift to the School Districts to show that their practices were justified by business necessity.[34] *Wards Cove*, 490 U.S. at 658, 109 S.Ct. at 2125; Appellant's Brief at 38. This means that the court would have to consider, first, the employer's justification for the use of these practices, and, second, the availability

32. *Id.* at 161.

33. Study at 162.

34. Justice Stevens argues in his dissent in *Wards Cove*, 490 U.S. at 670–71, 109 S.Ct. at 2131–32 (Stevens, J., dissenting), that in a disparate impact inquiry, after the plaintiff has shown that the challenged employment practice has a significant, adverse effect on an identifiable class of workers, the *burden of proof shifts* to the employer to justify the practice by explaining why it is necessary to the operation of the business. Such a justification is a classic example of an affirmative defense. *Id.*

The majority in *Wards Cove*, however, disagrees with Justice Stevens. According to the majority, after an employee has made a prima facie case of disparate impact, the employer is then faced only with the burden of producing evidence of a business justification. *Id.* at 659, 109 S.Ct. at 2125. "The burden of persuasion ... remains with the disparate-impact plaintiff. To the extent that the Ninth Circuit held otherwise in its en banc decision ... suggesting that the persuasion burden should shift to petitioners once respondents established a prima facie case of disparate impact—its decisions were erroneous." *Id.*

Congress overruled the Court's distribution of burdens in *Wards Cove* in the Civil Rights Act of 1991. Congress found that "the decision of the Supreme Court in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) weakened the scope and effectiveness of Federal civil rights protections." § 2, 1991 Civil Rights Act. The relevant section of the Act overruling the Court's distribution of burdens provides in part that "[a]n unlawful employment practice based on disparate impact is established under this title only if—(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." § 105, 1991 Civil Rights Act. Under this scheme, the complaining party would have the burden of producing evidence and would also have the ultimate burden of persuasion, but once the complainant made a showing of disparate impact, the respondent must persuade the trier of fact that such practices are justified by business necessity.

of alternative practices to achieve the same business ends, with less racial impact. *Id.; see also Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). Although the Teachers' brief makes reference to the issue of business necessity, since we have concluded that the Teachers did not make out a prima facie case of disparate impact, there is no need for us to address this issue. Appellant's Brief at 38–40.

 In another section of their brief, the Teachers contend that the School Districts' discriminatory actions were *intentional.* Does this mean that the Teachers are claiming disparate treatment under Title VII? Appellant's Brief at 40. Under the theory of disparate treatment, there is no liability under Title VII unless the employee can show that the employer intentionally treated the employee or groups of employees unfairly because of race, color, sex, or national origin. A prima facie case of disparate treatment exists if the Teachers are able to show that (1) they are a member of a protected group, (2) they are qualified for the job that they held, (3) they were discharged, and (4) after they were discharged, their position was filled with a person who was not a member of a protected group. *Valdez v. San Antonio Chamber of Commerce,* 974 F.2d 592, 596 (5th Cir.1992); *Vaughn v. Edel,* 918 F.2d 517, 521 (5th Cir.1990). The disparate treatment argument is difficult for us to address because the district court made no findings as to whether the Teachers presented evidence to establish a prima facie case. In addition, the Teachers' brief discusses the merits of the disparate treatment claim without ever addressing whether the four elements of a prima facie disparate treatment claim under *Valdez* were met. 974 F.2d at 596. Giving the benefit of a doubt to the Appellant–Teachers, the Teachers fail to show any evidence or make any persuasive arguments that convince us that the School Districts acted with discriminatory intent. The Teachers argue that the School Districts' actual knowledge that

adoption of the TECAT would have an adverse effect on minorities is evidence of discriminatory intent. Appellant's Brief at 42. The Teachers also argue that the Commissioner of Education's recommendation for a higher cutoff score—a recommendation that would adversely impact blacks—is evidence of intent. *Id.* As support, the Teachers again cite to the statistics offered earlier to show statistical discrepancy—as of April 27, 1989, the overall pass rate was 95.58% for African–Americans, 99.16% for Hispanics, and 99.75% for whites.[35] We have no basis for concluding that an exam with an overall pass rate for African–Americans of 95.58%, despite the higher cutoff score, is evidence of intent to discriminate. In *Hill v. Mississippi State Employment Service,* 918 F.2d 1233, 1240 (5th Cir.1990), we held that although gaps in the plaintiff's statistical studies did not stand as the sole barrier to show pretext, the defendant's system of referring prospective employees to prospective employers appeared to be facially neutral; hence, there was no disparate treatment. Similarly, in the case at hand, the TECAT is a facially neutral examination—all teachers who wished to be certified in the State of Texas were required to pass the exam. Although facial neutrality at the bottom line cannot immunize an agency or employer from proved acts of discrimination against an individual or groups of individuals, we cannot infer discrimination from statistics that by and large are neutral. *Id.* In addition to supporting the facial neutrality of the exam, the high passage rate on the TECAT dispels any plausible claim of actual knowledge of an adverse impact. It is self-evident that any examination that purports to test competence will have an adverse effect on the test takers who do not pass because some of the test takers can be expected to fail. By itself, this is not evidence of intent to discriminate particularly in this instance where all teachers are required to take the test, and there is little statistical discrepancy in the minority

---

**35.** *See supra* note 24 and Chart IV: TECAT Cumulative Pass Rates From March 1986–April

*1989* (V. 4, p. 1268–75).

pass rates. The Teachers have not presented any direct evidence of intent to discriminate. *See Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir.1990) (holding that evidence that a black employee was *treated differently* in the employee evaluation process established discrimination in violation of Title VII); *Rendon v. AT & T Technologies*, 883 F.2d 388 (5th Cir.1989) (holding that evidence in the form of statistical studies in addition to anecdotal testimony was sufficient to support a claim for disparate treatment).

Since the School Districts' knowledge of the allegedly adverse impact of the TECAT on minority teachers and the raising of the cutoff rate are the Teachers' only possible proof of intent to discriminate, we conclude that the district court's grant of summary judgment was appropriate on the disparate treatment claim. There is no evidence that the School Districts acted with discriminatory intent.

Finally, with regard to the Title VII claims, in their pleadings, the Teachers named four independent school districts (Garrison, Tyler, Terrell, and Troup) and the State of Texas and its various agencies as defendants. The State argued before the trial court that it was entitled to summary judgment as a matter of law on the issue of whether the State was an "employer" of the teachers within the meaning of Title VII. The trial court correctly concluded that the Teachers' failure to make out a prima facie case of discrimination under their Title VII and the ADEA claims made it unnecessary for the court to resolve the issue of whether the State was an employer.[36]

### Age Discrimination In Employment Act Claim

■ The Teachers contend that the trial court erred in refusing to certify the Teachers' class for purposes of maintaining a suit under the Age Discrimination in Employment Act. 29 U.S.C. § 621–34. This court held in *Marshall v. Airpax Electron-*

*ics, Inc.*, 595 F.2d 1043 (5th Cir.1979), that the four elements that a plaintiff must initially prove under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), to maintain a Title VII case are also required to support a claim under the ADEA. Specifically, the court in *Marshall* held that a rejected job applicant must show the following in order to bring a discrimination suit: (i) that he belongs to a racial minority, (ii) that he applied and was qualified for a job for which the employer was seeking applicants, (iii) that despite his qualifications, he was rejected, and (iv) that after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *Id.* at 1044. The district court concluded, as discussed *supra*, that the Teachers had not applied for positions for which they were qualified (non-certified teaching positions), and, therefore, could not bring suit under either Title VII or the ADEA.

Unfortunately, the Teachers' argument with regard to the district court's ruling on the ADEA claim and class certification is at best unpersuasive. The totality of the Teachers' argument on this issue is set forth below:

> The Trial Court's Order of October 17, 1991 denying plaintiffs' motion to certify class was in error as plaintiffs met all legal requirements to represent the classs [sic] of similarly situated parties in this action. See Plaintiff's Memorandum in Support of Motion Authoricing [sic] Notice. R.Vol. 3 pg. 858–872 and Plaintiff Hattie Bradley's Response to Tyler I.S.D.'s second Supplemental memorandum in Opposition to Plaintiff's Motion for Class Certification. R.Vol. 1, pg. 213.

The Teachers' argument is nothing more than a bold, naked assertion that the district court erred. The Teachers *do not* discuss the legal standards involved for maintaining a class action under the

---

**36.** *See Fields v. Hallsville Indep. School Dist.*, 906 F.2d 1017 (5th Cir.1990) (holding that, under the hybrid economic realities/common law control test for determining the existence of an employ-

ment relationship, the State of Texas was not an employer of the plaintiff schoolteachers for purposes of maintaining a Title VII or ADEA action).

ADEA, the applicable standard of review, or how the district court erred in concluding that the Teachers could not bring suit under the ADEA. A mere reference to a memoranda filed with the district court in support of a motion authorizing notice is not, by itself, a sufficient appellate argument. For an appellate court to perform its role requires at least a minimal reasoned attack.

Whether the district court erred in ruling as it did on the ADEA claims cannot be decided by the discussion of these issues as presented in the Teachers' brief. This court is entitled to a reasoned statement of why the district court erred. By the brief nature of their claim, the Teachers wholly fail to demonstrate any error on the part of the district court. For that reason, we must affirm the trial court's ruling on the ADEA claim.

### Constitutional Claims

#### Due Process

■ The Teachers assert that the TECAT is unconstitutional because it violates due process. The Fourteenth Amendment forbids government conduct that deprives "any person of life, liberty, or property without due process of law." [37] Due process has two major meanings: first, substantive due process may require courts to void certain types of government action that infringe on individual rights and individual freedom of action; second, procedural due process may require government to assure that individuals are afforded certain procedures before they are deprived of life, liberty, or property. John E. Nowak, Ronald D. Rotunda, J. Nelson Young, *Constitutional Law* 452 (3d ed. 1986); *United States v. LULAC*, 793 F.2d 636, 647 (5th Cir.1986). Although the Teachers do not specify which prong of the due process clause the TECAT is supposed to violate, we can conclude from their brief that they are asserting a violation of their procedural due process rights. "No mechanism was created to challenge erroneous test results or terminations. The plaintiffs [Teachers]

did not receive a due process hearing." Appellant's Brief at 48.

■ As a preliminary matter, the procedural due process clause is implicated only if a person has a constitutionally recognized interest in life, liberty, or property. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The district court did not address the issue of whether the Teachers had any constitutionally recognized interest. Specifically, in the case at hand, the Teachers' constitutional claim depends on their having a property right in continued employment. The appellee Tyler I.S.D. (Tyler) argues that the Teachers had no property interest in continued employment because a property interest in employment must arise from the terms of the employment contract, which, in this case, stated that the terms of employment "shall be governed by ... the school laws of this state." Appellee Tyler I.S.D.'s Brief at 34. Tyler argues that since the contract incorporated by reference the requirement of certification under Texas law, once the Teachers were decertified, as a matter of law, they no longer had a property interest. We believe that this reasoning is defective.

The Supreme Court addressed a similar issue in *Cleveland Board of Education v. Loudermill*. 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). *Loudermill* involved a challenge to an Ohio civil service statute that provided that a civil servant was entitled to retain his position during good and efficient service, and could not be dismissed except for "misfeasance, malfeasance, or nonfeasance in office." *Id.* at 539, 105 S.Ct. at 1491. The Court in *Loudermill* concluded that just because an entitlement arose from state law did not mean that the legislature had the right to define the procedures to be followed to protect that entitlement. "The point is straightforward: the Due Process clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate

---

**37.** U.S. Const. amend. XIV.

procedures." *Id.* at 541, 105 S.Ct. at 1493. Once a legislature confers a property interest, it may not deprive a recipient of that property interest without adequate procedures even though a legislature may have elected not to confer a property interest in the first instance. *Id.* The "bitter with the sweet" [38] doctrine advocated by Tyler in the case at hand was rejected by the Court in *Loudermill.* Once a legislature has conferred a property interest in employment by enacting a statute that defines the terms of the employment, as is the case here, that interest is protected by the procedural guarantees of the due process clause. The state statute that defines the protected property interest may not also restrict the procedures that protect that interest. *Id.*

■■■ The threshold question in our procedural due process analysis is whether the Teachers have a constitutionally protected property interest in continued employment. *Spuler v. Pickar,* 958 F.2d 103, 106 (5th Cir.1992); *Baker v. McCollan,* 443 U.S. 137, 146–47, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979). A public school teacher has a constitutionally protected property interest in continued employment if he can demonstrate a reasonable expectation of continued employment. *Coats v. Pierre,* 890 F.2d 728, 732 (5th Cir.1989), *cert. denied,* — U.S. ——, 111 S.Ct. 70, 112 L.Ed.2d 44 (1990); *Ferguson v. Thomas,* 430 F.2d 852 (5th Cir.1970); *see also Perkins v. Board of Directors,* 686 F.2d 49, 51 (1st Cir.1982) (holding that a public employee has a constitutionally protected property interest if he has a reasonable expectation that his employment will continue). The nature of the property right in employment, however, is determined by state law. *Board of Regents v. Roth,* 408 U.S. 564,

568, 92 S.Ct. 2701, 2704, 33 L.Ed.2d 548 (1972). In the case at hand, the Teachers' employment contract was defined by §§ 23.28 & 13.101 of the Texas Education Code, which provided for fixed term and continuing term contracts, respectively. Specifically, § 23.28 provides for a maximum three year contract term for independent school districts having a scholastic population of less than 5,000, and a maximum five year contract term for those with a population in excess of 5,000. Sections 13.101–116 provide that teachers with probationary or continuing contracts have the right to a notice and a hearing in the event that the school board chooses to terminate the employment contract at the end of the term. Appellee Tyler's Brief at 34. The Teachers have not indicated to this court which provision of the Texas code governs their employment; in fact, the Teachers have not addressed the issue of whether there is a protected property interest at all. The Teachers entire argument consists of an assertion that the "bill which legislated the TECAT requirement contained no due process provision." Appellant's Brief at 48. The Texas courts have addressed these provisions of the Texas Education Code and have held that teachers employed under continuing contracts have a property interest in continued employment. *Roberts v. Houston Independent School District,* 788 S.W.2d 107, 109 (Tex.App.—Houston [1st Dist.], 1990, writ denied) (holding that a public teacher with a continuing employment contract possessed a property interest in continued employment). In the case at hand, however, two of the School Districts contend that their Teachers were employed under fixed term contracts as provided for under § 23.28 of the Texas Education Code; thus, they argue that these teachers (Bradley and Frazier) do not have

**38.** In his dissenting opinion in *Loudermill,* Chief Justice Rehnquist argued that the Court ought to "recognize the totality of the State's definition of the property right in question, and not merely seize upon one of several paragraphs in a unitary statute to proclaim that in that paragraph the State has inexorably conferred upon a civil service employee something which it is powerless under the United States Constitution to qualify in the next paragraph of the statute." 470 U.S. at 561, 105 S.Ct. at 1503. Chief Justice

Rehnquist contended that the statute that provided for the property interest in employment defined the scope of that property interest through procedures that defined how that interest could be terminated. It was therefore improper for the Court to divorce the property interest itself from the termination procedures. *Id.* This "bitter with the sweet" doctrine has not found support among the majority of the court. *See also Arnett v. Kennedy,* 416 U.S. 134, 152–54, 94 S.Ct. 1633, 1643–44, 40 L.Ed.2d 15 (1974).

property interest in continued employment.[39] *Wells v. Hico Indep. School Dist.,* 736 F.2d 243 (5th Cir.1984), *cert. dismissed,* 473 U.S. 901, 106 S.Ct. 11, 87 L.Ed.2d 672 (1985). That the Teachers' employment contracts are fixed term contracts is not disputed. This court has held that unless a school district has adopted the Texas continuing contract provision, public school teachers under fixed term contracts do not have property interests in their teaching positions extending beyond the term of the contracts. *Wells,* 736 F.2d at 255. In the case at hand, however, the Teachers are not attempting to extend the term of their teaching contracts, rather they are arguing that they have a property interest during the term of employment that was cut short as a result of their dismissal for failing the TECAT. It is reasonable for a teacher with a fixed term contract to expect to be employed until the term of the contract has expired. To conclude otherwise would render § 23.28 meaningless in terms of its definition of a fixed term employment contract, because such a conclusion would make a fixed term contract the equivalent of an at-will employment contract. The Frazier, Bradley, and Alexander teaching contracts are remarkably similar—each provides explicitly that the contract does not create any property interest in *continued* employment beyond the contract term, implying that during the term of the contract, a protected property interest exists.[40] We conclude that a teacher employed under the terms of a fixed term contract as defined by Tex.Educ.Code Ann. § 23.28 has a constitutionally protected property interest in employment until the term of the contract has expired. *See United States v.*

*LULAC,* 793 F.2d 636 (5th Cir.1986); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

▮▮▮ Having concluded that the Teachers have a property interest in employment, we next consider whether the procedures afforded the Teachers were constitutionally adequate. In the case at hand, the district court held that the procedures involved in the administration of the TECAT and subsequent decertification resulting from the failure of the test provided adequate protection of the Teachers' due process rights.[41]

Specifically, the district court found that the Teachers were given more than one opportunity to pass the TECAT and, further, there were procedures in place that afforded the Teachers the opportunity to appeal the revocation of their certification to the Texas commissioner of education, and the right to judicial review of that administrative proceeding in a state district court.[42] The Texas Supreme Court addressed this issue directly in *State v. Project Principle,* 724 S.W.2d 387, 389 (Tex. 1987), when the Court held that the right to appeal the revocation of their teaching licenses after the teachers had failed the TECAT, and the right to judicial review of that action were sufficient to satisfy the procedural due process guarantees of the Fourteenth Amendment. *Id.* at 391. Although we are not bound by the pronouncements of a state court regarding the scope of federal constitutional guarantees, the Teachers have again failed to show that the trial court erred in concluding that the procedures available to the Teachers were con-

---

**39.** Although the briefs make no mention of whether Teacher–Appellees Alexander and Griffin had continuing or fixed term teaching contracts, the record indicates that were also employed under fixed term contracts. Griffin was employed for the 1986–87 school term (one year) with Troup ISD, and Alexander was employed for the 1986–89 school terms (three years) with Terrell ISD. Alexander's Contract, Record V. 2, p. 352; Griffin's Contract, Record V. 2, p. 356–57. Therefore, this discussion of whether a protected property interest exists in fixed term contracts applies to Alexander and Griffin as well.

**40.** Frazier's Contract, Record V. 2, p. 432; Bradley's Contract, Record V. 2, p. 349; Alexander's Contract, Record V. 2, p. 352. The Griffin contract contains no such explicit provision, but the existence of this provision is not the only factor determinative of whether a property interest exists.

**41.** Trial Court Order, V. 1, p. 12.

**42.** Tex.Admin.Code tit. 19, § 157.1(b) (1992); Trial Court Order, V. 1, p. 13.

stitutionally adequate. In fact, the Teachers' argument consists of nothing more than another bold assertion that the state procedural mechanisms were violative of procedural due process. Appellant's Brief at 48. In the absence of any persuasive arguments—which are absent here—there is no basis for overruling the district court's judgment on this issue.

### Equal Protection

Although the Teachers allege violations of their rights under the Equal Protection clause of the Fourteenth Amendment in their complaint,[43] the Teachers have failed to raise this issue on appeal. Therefore, this issue is waived.

### TRIAL COURT'S REFUSAL TO CONSOLIDATE WITH U.S. v. TEXAS

The Teachers assert that the district court erred by refusing to consolidate this case under F.R.Civ.P. 42(a)[44] with *U.S. v. Texas,* 447 F.2d 441 (5th Cir.1971), *cert. denied,* 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972), the long-running state desegregation case.[45] Under F.R.Civ.P. 42(a), a trial court may consolidate multiple actions if the actions involve common questions of law or fact. On appeal, a trial court's decision not to consolidate is reviewed under an abuse of discretion standard. *Davis v. Yellow Cab Company of St. Petersburg,* 220 F.2d 790, 791 (5th Cir. 1955).

*U.S. v. Texas,* 447 F.2d at 443, involved the appeal of an order issued by the United States District Court for the Eastern District of Texas requiring the Texas public schools to take "whatever steps might be necessary to * * * eliminate racial discrimination." The Fifth Circuit in *U.S. v. Texas* revised the original district court order and remanded the case to the district court with instructions to the Commissioner of Education, the Texas Education Agency, its officers, agents, employees, and successors to cease support of any student transfers, school transportation, extra-curricular activities, treatment of faculty and staff, student assignments, and curriculum and education programs that reinforced or encouraged discriminatory treatment on the basis of race, color, or national origin. *Id.* at 443–48. The Fifth Circuit maintained jurisdiction to enforce or modify this desegregation decree. *Id.* at 449. The Teachers contend that the trial court abused its discretion by not consolidating the case at hand with *U.S. v. Texas,* because the failure to consolidate might raise "the specter of conflicting decisions." Appellant's Brief at 28. The Teachers do not argue that the School Districts were parties to the original *U.S. v. Texas* case, nor do they argue that consolidation would avoid unnecessary costs or delay, or that the denying consolidation would prejudice them in any way. The Teachers only contend that use of the TECAT violated paragraph (E)(1) of the *Texas* order which requires in part the following:

> Defendants shall not permit, make arrangement for, acquiesce in or give support of any kind to the hiring, assigning, promoting, paying, demoting, reassigning or dismissing, or treatment of faculty and staff members who work directly with children in a discriminatory manner on account of race, color, or national origin. 447 F.2d at 446.

The Teachers accuse the State of violating this order by adopting the TECAT, a test that allegedly discriminates against minorities on the basis of race or national origin. The Teachers also accuse the State of purposeful discrimination—"[t]hey

**43.** Plaintiff's Second Amended Complaint, V. 5, p. 1936–48.

**44.** F.R.Civ.P. 42(a) provides as follows: "Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it

may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

**45.** *United States v. Texas,* 321 F.Supp. 1043 (E.D.Tex.1970) *and United States v. Texas,* 330 F.Supp. 235 (E.D.Tex.1971), *aff'd and modified,* 447 F.2d 441 (5th Cir.1971), *cert. denied,* 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972).

[adopted the TECAT] knowing that implementation of the TECAT would drastically reduce the number of minority teachers in public schools." Appellant's Brief at 29. The Teachers then launch wave after wave of assaults on the School Districts, none of which address either the substantive prerequisites of consolidation under F.R.Civ.P. 42(a) or whether the trial court abused its discretion in refusing to consolidate. Appellant's Brief at 29–31.

Consolidation is used to cover three procedurally different situations: (1) when a court stays all but one of several actions until that one is tried, at which point that judgment in the one trial is conclusive as to all others; (2) when a court combines several actions into one action in which a single judgment is entered; and (3) when a court orders several actions to be tried together but each retains its separate character and requires entry of a separate judgment. 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2382 (1971). Although the language of the rule itself suggests that the second situation—the combination of several actions into one judgment—is proper, the case law has shown a preference for limiting consolidation to the third situation; thus, actions maintain their separate identity even if consolidated. *Johnson v. Manhattan Ry.*, 289 U.S. 479, 496–97, 53 S.Ct. 721, 727–28, 77 L.Ed. 1331 (1933).

The State first argues that consolidation is inappropriate in this case because there are currently no triable issues of fact pending before the trial court in the *U.S. v. Texas* case, such that consolidation would serve the interests of judicial economy. Appellee's Brief at 43. In this respect, the State is correct. The factual issues in the *U.S. v. Texas* case were resolved some twenty-one years ago, and this court's continuing jurisdiction over that case is for the sole purpose of ensuring proper enforcement of that decree.

Second, the State argues that there are no common questions of law. Again, the State is correct. The case at hand is a separate cause of action that challenges actions taken by the state legislature,

which the Teachers have alleged are both illegal and unconstitutional. In *U.S. v. Texas*, the court order was directed to the executive branch of the state government, ordering that branch to cease activities that tended to reinforce, renew, or encourage segregation. In addition, the Fifth Circuit in *U.S. v. Texas* expressly held that its desegregation order "shall not be construed to have any effect on the State and Federal remedies available to any individual member of faculty or staff." 447 F.2d at 442. The Teachers' causes of action under Title VI, Title VII, ADEA, Due Process, and Equal Protection are the type of separate federal remedies contemplated by this court in *U.S. v. Texas*. If we were to adopt the Teachers' reasoning and order that this case be consolidated with *U.S. v. Texas*, then conceivably all causes of action involving allegations of public school discrimination would fall under this court's continuing jurisdiction in that case, a result that we clearly did not intend in *U.S. v. Texas*.

The Teachers have not shown how the trial court abused its discretion in refusing to consolidate. Federal district courts have very broad discretion in deciding whether or not to consolidate. 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2383 (1971). The Teachers make another bold assertion that the failure to consolidate would raise the spectre of conflicting decisions, and result in a lack of uniformity that would undermine the integrity of the bench. Appellant's Brief at 28. Such a doomsday prediction is unfounded because the purpose of consolidation is to "avoid unnecessary costs or delay," and the Teachers have not shown how consolidation would serve this purpose. The district court, therefore, did not abuse its discretion by refusing to consolidate the case at hand with *U.S. v. Texas*.

## RETROACTIVITY OF TITLE VII OF THE 1991 CIVIL RIGHTS ACT

The Teachers have alleged that the trial court erred in refusing to apply the 1991 Civil Rights Act retroactively to give the Teachers a jury trial and an instruction on compensatory damages as prescribed by

§ 102, Title I, of the act.[46] In their brief, the Teachers have asked this court, on remand, to instruct the trial court to apply the 1991 Civil Rights Act retroactively. The Teachers' argument rests on the assumption that they will prevail on the issue that the trial court erred in granting the School Districts' motion for summary judgment on all the substantive issues of law. Since we affirm the trial court's judgment in favor of the School Districts, the issue of retroactivity is moot.[47]

## TRIAL COURT'S REFUSAL TO CERTIFY CLASS

Finally, the Teachers contend that the trial court erred in refusing to certify as a class, under F.R.Civ.P. 23, schoolteachers over forty years of age who had been terminated as a result of their failing the TECAT. Appellant's Brief at 49. Since this point of error also rests on the assumption that the trial court erred in granting summary judgment in favor of the School Districts, our affirmance of the district court's judgment on summary judgment renders this issue moot.

## CONCLUSION

For the reasons discussed above, the trial court's judgment was correct.

**AFFIRMED.**

---

**46.** "(a) Right of Recovery.—
(1) Civil Rights.—In an action brought by a complaining party ... the complaining party may recover compensatory damages and punitive damages ...
"(c) Jury Trial.—If a complaining party seeks compensatory punitive damages under this section—
(1) any party may demand a trial by jury...." Civil Rights Act of 1991, Title I, §§ 102(a), (c).

**47.** This court recently held that the amendments to Title VII under the Civil Rights Act of 1991 do not apply retroactively. *Rowe v. Sullivan,* 967 F.2d 186 (5th Cir.1992).

# APPENDIX

### I. TECAT PASS RATES ON THE March 10, 1986 EXAM BY ETHNICITY

**TECAT Pass Rates On The March 10, 1986 Exam (Record Y.4, p. 1560)**

## II. TECAT CUMULATIVE PASS RATES BY ETHNICITY

### III. TECAT CUMULATIVE PASS RATES FROM March 1986-April 1989

**TECAT Cumulative Pass Rates From March 1986 – April 1989 (Record V.4, p. 1268-74)**

## IV. TECAT PASS RATES BY ETHNICITY AND AGE

This chart is based on data submitted by the Center For Statistical Consulting and Research at the Southern Methodist University in Dallas, Texas.

Pass Rates By Ethnicity And Age (Record V.4, p. 1279)

**V. FAILURE RATE BY ETHNICITY--October 1986 TECAT**

Failure Rates By Ethnicity--October 1986 TECAT
(Record V.4, p. 1561)

WHITE/OTHER: 24.28%

BLACKS: 51.62%

HISPANIC: 24.10%